OPINION HEADING PER CUR 







                     NO. 12-01-00258-CV
 
IN THE COURT OF APPEALS

TWELFTH COURT OF APPEALS DISTRICT

TYLER, TEXAS



TEXAS ELECTRIC COOPERATIVE AND
STEPHEN PAUL BUMSTEAD,                       §     APPEAL FROM THE 349TH
APPELLANTS


V.                                                                         §     JUDICIAL DISTRICT COURT OF

MARY R. DILLARD, INDIVIDUALLY AND 
AS COMMUNITY SURVIVOR OF THE
ESTATE OF KENNETH LEWIS DILLARD,  §     ANDERSON COUNTY, TEXAS
DECEASED, AND MARY R. DILLARD,
A/N/F FOR KIMBERLY DILLARD,
A MINOR,
APPELLEES






OPINION
            Texas Electric Cooperative (“TEC”) and Stephen Bumstead appeal a judgment for damages
awarded to Mary Dillard following a jury trial. TEC and Bumstead raise three issues on appeal. We
affirm.

Background
            On May 27, 1996, Bumstead was driving a TEC tractor-trailer rig loaded with utility poles
from Jasper, Texas to Muenster, Texas. At approximately 10:00 p.m., while traveling westbound
on two-lane US Highway 175, Bumstead crested a hill overlooking the Neches River bridge.


 As
he crested the hill, Bumstead saw eight or nine cows wandering about on the highway between his
truck and the bridge. Bumstead’s truck collided with one of the cows, which fell dead in the
eastbound lane about two hundred fifty feet from the bridge. Bumstead had difficulty maintaining
control of his tractor-trailer after the collision, but was able to cross the bridge and stop the truck
about three-tenths of a mile (1,584 feet) beyond where the dead cow lay. 
            Bumstead immediately radioed the driver of an approaching eastbound Arkansas Freightways
tractor-trailer to warn him of the dead cow in the roadway. Bumstead also requested that the trucker,
who had a cell phone, contact 9-1-1 to report the accident. The Arkansas Freightways truck avoided
the carcass in the road and continued eastbound towards Cuney, Texas. 
            Minutes later, May Joyce Brown, who was traveling eastbound on US 175, unwittingly drove
past Bumstead’s unilluminated rig and across the bridge. According to Brown, as she crossed the
bridge, she was traveling between thirty-five and forty miles per hour. After crossing the bridge,
she came upon the cow carcass in her lane. Brown stated that she did not have time to apply her
brakes before her car struck the cow carcass and vaulted into the westbound lane. Still airborne,
Brown’s car struck the Dillards’ vehicle, killing Kenneth Dillard and injuring his wife, Mary, and
daughter, Kimberly. 
            Mary Dillard filed suit against TEC and Bumstread both in her capacity as community
survivor of Kenneth Dillard and as next friend of their minor daughter. The matter proceeded to
jury trial. Ultimately, the trial court entered a judgment that TEC’s and Bumstead’s negligence
caused the death of Kenneth Dillard and the injuries of Mary and Kimberly Dillard and awarded
damages. This appeal followed.




Expert Testimony
            In their second issue, TEC and Bumstead contend that the trial court erred in refusing to
permit Department of Public Safety (“DPS”) Officer Cleland to testify as an expert witness
concerning Bumstead’s ability to avoid hitting the cow. The pertinent testimony is as follows:



 
              Q.          All right. Is there any way for you, as we sit here today, to determine, given the
truck being driven by Mr. Bumstead traveling fifty miles an hour with an eighty-thousand-pound load, whether or not he would have had time to stop or avoid the
cows once he saw them the night of the accident?
 
              A.          No, I wouldn’t say that. There are two factors involved here. One is that the cow
was dark in their color and low beam headlights, or even high beam headlights
probably have about three hundred feet ahead of you. A person still has to interpret
what they’re seeing, along with reaction time, and so absolutely not. I don’t think
he could have avoided it.
 
              The decision whether to admit evidence rests within the discretion of the trial court. E.I. du
Pont de Nemours & Co. v. Robinson, 923 S.W.2d 549, 558 (Tex. 1995). A two-part test governs
the admissibility of expert testimony: (1) the expert must be qualified and (2) the testimony must
be relevant and be based on a reliable foundation. See Helena Chemical Company v. Wilkins, 47
S.W.3d 486, 499 (Tex. 2001). To be relevant, the proposed testimony must be sufficiently tied to
the facts of the case that it will aid the jury in resolving a factual dispute. Robinson, 923 S.W.2d at
556; see also Kumho Tire Co. v. Carmichael, 526 U.S. 137, 150, 199 S. Ct. 1167, 1175, 143 L. Ed.
2d 238 (1999) (when the factual basis of testimony is sufficiently called into question, the trial judge
must determine whether the testimony has a reliable basis and is therefore admissible). If an expert
relies upon unreliable foundational data, any opinion drawn from that data is likewise unreliable. 
Wilkins, 47 S.W.3d at 499. 
            Cleland testified that he had joined the DPS in 1990. He showed that he had been trained
in advanced accident investigation as well as advanced commercial accident reconstruction and had
received over five hundred hours of training in both disciplines. Further, Cleland testified that he
had personally investigated over four hundred accidents during his tenure with the DPS. We
conclude that the trial judge heard sufficient testimony to establish Cleland’s credentials as an expert
witness.
            When Cleland attempted to testify regarding his opinion concerning whether Bumstead could
have avoided the cows, it was within the trial court’s discretion to examine his testimony before
allowing the jury to hear it. Cleland testified that he did not recall if he had ever spoken with
Bumstead about his collision with the cow. Cleland stated that Officer Fulton had investigated
Bumstead’s collision with the cow. Further, Cleland did not ever testify that he had spoken with
Fulton about his investigation of Bumstead’s collision with the cow. Indeed, Cleland noted that he
could not testify about Bumstead’s ability to avoid the cows because that would amount to
speculation.    However, in his testimony before the jury, Cleland did offer his opinion as to whether
Bumstead could have avoided the cows. If the foundational data underlying opinion testimony is
unreliable, an expert will not be permitted to base an opinion on that data because any opinion drawn
from that data is likewise unreliable. Merrell Dow Pharms. v. Havner, 953 S.W.2d 706, 714 (Tex.
1997); see also Burroughs Wellcome Co. v. Crye, 907 S.W.2d 497, 499 (Tex.1995) (“When an
expert’s opinion is based on assumed facts that vary materially from the actual undisputed facts, the
opinion is without probative value.”). Here, the record fails to demonstrate that Cleland had
adequate facts to enable him to form an opinion concerning whether Bumstead could have avoided
the cow he hit. We hold that the trial court did not abuse its discretion in refusing to allow the jury
to hear Cleland’s opinion testimony. TEC and Bumstead’s second issue is overruled. 
 
Legal and Factual Sufficiency
            In their third issue, TEC and Bumstead contend that the evidence of causation supporting the
jury’s negligence findings is neither legally nor factually sufficient. 
Standard of Review
            In conducting a legal sufficiency review, we review the evidence in a light that tends to
support the finding of the disputed facts and disregard all evidence and inferences to the contrary. 
Lee Lewis Construction v. Harrison, 70 S.W.3d 778, 782 (Tex. 2001). Anything more than a
scintilla of evidence is legally sufficient to support the finding. Formosa Plastics v. Presidio
Engineers, 960 S.W.2d 41, 48 (Tex. 1998). 
            When reviewing a jury verdict to determine the factual sufficiency of the evidence, a court
of appeals must consider and weigh all of the evidence and should set aside the verdict only if it is
so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. See Cain
v. Bain, 709 S.W.2d 175, 176 (Tex. 1986). This court is not a fact finder and may not pass on the
credibility of the witnesses or substitute our judgment for that of the trier of fact. Clancy v. Zale
Corporation, 705 S.W.2d 820, 826 (Tex. App.-Dallas 1986, writ ref’d n.r.e.). Findings of fact are
the exclusive province of the jury. See Bellefonte Underwriters Ins. Co. v. Brown, 704 S.W.2d 742,
744 (Tex. 1986). Accordingly, if there is sufficient competent evidence of probative force to support
the finding, it must be sustained. Beall v. Ditmore, 867 S.W.2d 791, 795–96 (Tex. App.-El Paso
1993, writ denied). When there is conflicting evidence, the jury’s verdict on such matters is
generally regarded as conclusive. Id. at 796. 
Analysis
            To prove negligence, the plaintiff must introduce admissible evidence that there existed a
legal duty owed by the defendant to the plaintiff, a breach of that duty, and damages proximately
caused by the breach. Harrison, 70 S.W.3d at 782. Proximate cause consists of two
elements—cause in fact and foreseeability. See Travis v. City of Mesquite, 830 S.W.2d 94, 98 (Tex.
1992). Cause in fact, which may be proven by circumstantial evidence, is established if the negligent
conduct was a substantial factor in bringing about the injury and without it, harm would not have
occurred. Id. The test for foreseeability is satisfied if a person of ordinary intelligence should have
anticipated the danger caused by his negligent conduct. Id.
            Dillard contends that both of the collisions were caused by TEC’s and Bumstead’s
negligence. She contends that the first collision was caused when TEC overloaded Bumstead’s
trailer with utility poles, which led to his driving too fast with a top-heavy load at the time he crested
the hill and saw cows on the road. She further contends that the second collision involving Brown
and the Dillards’ pickup was caused by Bumstead’s failure to warn Brown of the dead cow in her
lane on the other side of the bridge as Brown passed Bumstead’s unilluminated rig. 
            TEC and Bumstead contend that Bumstead was driving below the speed limit and that he did
not have time to stop before striking one of the cows. They also contend that there was nothing
Bumstead could have reasonably done to warn Brown before she struck the dead cow. 
            The uncontroverted evidence demonstrated that the dead cow was found 1,750 feet away
from the crest of the hill. Bumstead testified that he saw the cows as his truck crested the hill. 
Bumstead acknowledged that, under reasonable circumstances, he could bring the tractor-trailer to
a stop within three hundred feet. However, Bumstead testified that on the night in question, he could
not stop in time because his truck was top-heavy due to the load of utility poles. 
            TEC and Dillard argue that Bumstead was traveling only about fifty miles per hour, well
under the speed limit. They further contended that Bumstead had only between two and three
seconds to respond to the cows in the road and, therefore, did not have time to stop before he hit one. 
We conclude that it was not unreasonable for the jury to determine from the evidence before it that
Bumstead crested the hill traveling too fast considering the top-heavy load he was carrying and that
such was the proximate cause of his collision with the cow. 
            Dillard further contends that Bumstead recognized the danger when he radioed the driver of
the Arkansas Freightways truck to warn him of the dead cow lying in the road ahead and, therefore,
undertook a duty to warn others of the danger. She insists that Bumstead should have kept the lights
for his truck illuminated and should have activated his emergency flashers to warn oncoming traffic. 
 Dillard also contends that Bumstead could have used a flashlight and other warning devices, such
as triangles, to alert oncoming traffic that the dead cow was lying in the roadway ahead.
            Bumstead responds that he did not have an opportunity to get out of his truck before Brown
collided with the cow. Bumstead testified that as he opened his door, he heard the sound of Brown’s
vehicle striking the Dillard vehicle and immediately saw the flashing lights of the DPS patrol car
after he heard the collision. Bumstead further contends that even if he had time to get out of his
vehicle to warn traffic, he could not have reasonably been expected to warn traffic from both
directions. TEC and Bumstead also note that Richard Turner, the accident reconstructionist who
testified on behalf of Dillard, stated that the requirements of the Texas Department of Transportation
are that a trucker that has been involved in an accident has ten minutes to put out safety devices. 
            Joe Knight was following the Dillards’ vehicle that night. Knight testified that he was a
retired law enforcement officer, having served with the Cockerell Hill Police Department, the San
Augustine County Sheriff’s Department, the City of Irving Police Department as a sergeant, and
finally as police chief for the City of Seven Points. Knight testified that he arrived at the scene of
the Brown-Dillard collision at approximately 10:17 p.m. Knight further stated that he had called 
9-1-1 immediately upon arriving at the scene. Knight testified that as a law enforcement officer, he
had worked numerous accident scenes. He further stated that he immediately activated the
emergency flashers on his car, exited his vehicle, and began using a flashlight to direct traffic around
the carcass of the dead cow and the Brown-Dillard collision. Knight stated that he was able to keep
the traffic safely moving around the scene until about 10:26 p.m., at which time he made a second
9-1-1 call pleading for emergency personnel to come to the scene. Phone records admitted into
evidence confirm the timing of Knight’s two 9-1-1 calls. Knight further testified that soon after his
second 9-1-1 call, DPS Officer Jim Cleland arrived at the east side of the bridge. Cleland’s records
indicate that he arrived at the scene at 10:25 p.m. after being notified of the accident at 10:20 p.m. 
Cleland immediately took charge of the scene and later investigated the Brown-Dillard collision on
behalf of the DPS. DPS Officer Richard Fulton later arrived on the west side of the bridge and
interviewed Bumstead concerning his collision with the cow. 
            Fulton testified that he believed Bumstead’s story that the second collision occurred as he
was first exiting his truck was inconsistent with the facts. Further, Knight’s testimony directly
contradicted Bumstead’s testimony that he immediately got out of his truck after parking it and, at
that point, heard Brown’s car collide with the Dillards’ vehicle and saw the DPS vehicle with its
lights flashing. Knight further stated that he passed the Arkansas Freightways truck with the two
trailers at least four miles to the east of the Brown-Dillard collision. We conclude that the jury was
entitled to believe the testimony of Cleland, Fulton, and Knight that Bumstead’s recollection as to
the timing of the Brown-Dillard collision was inaccurate. 
            TEC and Bumstead argue that causation is not established if the defendant’s conduct does
no more than furnish the condition that makes the plaintiff’s injury possible. Union Pump Co. v.
Allbritton, 898 S.W.2d 773, 776 (Tex. 1995). Although Union Pump was a products liability case,
the court cites to an earlier supreme court case concerning causation that involved two collisions. 
See Union Pump, 898 S.W.2d at 776 (citing Bell v. Campbell, 434 S.W.2d 117 (Tex. 1968)).
            In Bell two automobiles had collided. See Bell, 434 S.W.2d at 118. A trailer attached to a
vehicle in the first collision overturned and remained in the roadway. Id. A crowd gathered after
the collision, and a person went down the highway from the scene with a flashlight to signal to
oncoming traffic that its lane of travel was obstructed. Id. at 119. An intoxicated driver either
ignored or did not see the warnings from the person with the flashlight and drove into the crowd,
injuring three people. Id. The supreme court held that the drivers of the two vehicles in the first
collision had not proximately caused the second collision between the intoxicated driver and the
three men attempting to remove the trailer from the road. Id. at 122–123. The court stated that “all
forces involved in or generated by the first collision had come to rest, and no one was in any real or
apparent danger therefrom.” Id. at 120. 
            In the case at hand, the forces generated by Bumstead’s collision with the cow were still
continuing at the time Brown came upon the cow and vaulted into the Dillard pickup. Brown and
the Dillards were in imminent danger from the remains of Bumstead’s collision with the cow. Even
Bumstead recognized there was a danger with a cow’s carcass in the eastbound lane of the highway
because he immediately radioed the approaching Arkansas Freightways trucker of its existence. We
conclude that the jury could have determined that Bumstead’s failure to warn Brown about the cow’s
carcass obstructing her lane was a cause in fact leading to Kenneth Dillard’s death and the injuries
to Mary and Kimberly Dillard. The jury could have further determined Bumstead’s failure to warn
was a substantial factor that caused the Brown-Dillard collision and that the harm would not have
occurred had Bumstead successfully warned Brown of the dead cow in the roadway. Finally, the jury
could have also reasonably determined that Bumstead should have anticipated further collisions
because the record reflects that he did so anticipate with respect to the driver of the Arkansas
Freightways truck. Therefore, we hold there was both legally and factually sufficient evidence to
establish all of the elements of negligence attributed to TEC and Bumstead. TEC and Bumstead’s
third issue is overruled. 

Spoliation Presumption
            In their first issue, TEC and Bumstead contend that the trial court erred when it submitted
the following instruction to the jury:
 
You are instructed that if there is evidence that is pertinent to the issues in this cause, which was in the
exclusive possession and control of a party and which cannot be produced, and its disappearance or
non-production has not been satisfactorily explained, then you may consider that such evidence
contained information adverse to the position taken by the party who was in the possession.
 
              The loss or destruction of evidence may seriously impair a party’s ability to present its case. 
Wal-Mart Stores, Inc. v. Johnson, 106 S.W.3d 718, 721 (Tex. 2003). A spoliation instruction is
an instruction given to the jury outlining permissible inferences they may make against a party who
has lost, altered, or destroyed evidence. Brewer v. Dowling, 862 S.W.2d 156, 159 (Tex. App.-Fort
Worth 1993, writ denied). A party who has deliberately destroyed evidence is presumed to have
done so because the evidence was unfavorable to its case. Johnson, 106 S.W.3d at 721. A trial
judge has broad discretion in determining whether to provide a jury with a spoliation presumption
instruction. See Trevino v. Orgeta, 969 S.W.2d 950, 953 (Tex. 1998); see also Johnson, 106
S.W.3d at 721 (a trial judge should have discretion to fashion an appropriate remedy to restore the
parties to a rough approximation of their positions if all evidence were available). 
            In the instant case, TEC admitted that it had destroyed Bumstead’s logbook and all of the
other documents regarding his trip events of May 27, 1996. William Gee, the dispatcher for TEC,
stated that it was the policy of TEC to keep these records for only six months and then destroy them. 
Gee further testified that he was the individual who had thrown away Bumstead’s logbook and the
other documents pertaining to his trip of May 27. He stated that he did this as part of TEC’s normal
operating procedure. 
            Dillard contends that the logbooks would have been helpful in indicating exactly how fast
Bumstead had been driving during the 120 miles of this trip before he hit the cow. Dillard also
contends that the destroyed documents could have shown that Dillard’s trailer was overloaded and,
therefore, considering the amount of his load, his speed was excessive. 
            Before any failure to produce material evidence may be viewed as discovery abuse, the
opposing party must establish that the nonproducing party had a duty to preserve the evidence in
question. Id. at 722. There must be a sufficient foundational showing that the party who destroyed
the evidence had notice both of the potential claim and of the evidence’s potential relevance thereto. 
Id. An objective test for anticipation of litigation is whether a reasonable person would conclude
from the severity of the accident and other circumstances surrounding it that there was a substantial
chance for litigation. Id.
            Dillard established that one of her attorneys, Roland Brown, wrote TEC a letter dated
October 24, 1996. In his letter, Brown notified TEC that he had been employed to represent Mary
Dillard and her daughter in connection with their injuries and the death of Kenneth Dillard that arose
out of the Bumstead collision with the cow in Cherokee County on May 27, 1996. TEC
acknowledged the receipt of Brown’s letter in a letter to Brown dated October 30, 1996 from D.L.
Lively, who identified himself as a manager with TEC. In his letter, Lively contested the fact that
a TEC vehicle was involved in the specific collision that led to Kenneth Dillard’s death and the
injuries of Mary and Kimberly Dillard. It is uncontested that the correspondence between Brown
and Lively occurred within six months of the May 27 collisions. Thus, the record before the trial
judge indicated that TEC had knowledge of Dillard’s claim and understood its severity before Gee
destroyed Bumstead’s logbook and other documents. We hold that the trial judge did not abuse his
discretion in instructing the jury on the spoliation presumption. TEC and Bumstead’s first issue is
overruled.

Conclusion
            Having overruled TEC and Bumstead’s first, second, and third issues, we affirm the trial
court’s judgment.
                                                                                                     JAMES T. WORTHEN 
                                                                                                                 Chief Justice

Opinion delivered July 20, 2005.
Panel consisted of Worthen, C.J., Griffith, J. and DeVasto, J.









(PUBLISH)